IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA21-471

Filed 5 December 2023

Buncombe County, Nos. 16 CRS 084811-12, 17 CRS 000106

STATE OF NORTH CAROLINA

v.

NATHANIEL E. DIXON, Defendant.

Appeal by Defendant from judgments entered 16 July 2019 by Judge R. Gregory Horne in Buncombe County Superior Court. Originally heard in the Court of Appeals 20 September 2022.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Sherri Horner Lawrence, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender James R. Grant, for defendant-appellant.*

MURPHY, Judge.

Where a Defendant cannot demonstrate at the third step of *Batson* that the State acted on a discriminatory purpose with respect to race and that the trial court clearly erred in its ruling, we will not overturn the denial of a *Batson* ruling on appeal. Here, taking into account the whole Record as it existed before the trial court at the time of Defendant's *Batson* objection, we are not persuaded that the State's peremptory strike of one of only two African American prospective jurors in the jury pool was motivated by discriminatory intent, even where the State made a greater effort to rehabilitate other jurors who expressed reservations about the death penalty,

because we cannot be confident the trial court was mistaken in its conclusion that reservations about the death penalty still explained the exercise of the strike.

Furthermore, given the high degree of discretion with which a trial court is entrusted in ruling on a motion for mistrial, we cannot say the trial court abused that discretion in denying Defendant's. The trial court also permissibly ruled on all motions for mistrial, as the trial judge was not a witness in any associated hearing.

## BACKGROUND

This case arises out of Defendant Nathaniel E. Dixon's appeal of his criminal convictions for first-degree murder, attempted first-degree murder, and malicious maiming on 26 June 2019, following a high-profile jury trial that lasted several weeks and garnered significant media attention. During voir dire, the State struck an African American[1] potential juror, R.D.,[2] who expressed reservations about the death penalty:

> [R.D.]: Personally I have reservations about the death penalty. Simply because [it's] disproportionate. Most people who know anything about the death penalty know[] that the statistics show that African American[s] receive it more than others. You know, this is weighed on me like quite a bit. Just back and forth. And . . . I wish I wasn't here, honestly. I wish the reason that I'm here never occurred. And . . . that's not a presumption of guilt or

---

[1] For consistency with the Record, we use the term "African American" in this opinion, though we use it interchangeably with the term "black" referenced in our caselaw. Furthermore, as this case involves an appeal from a *Batson* objection, we note that Defendant is African American.

[2] To limit the use of juror and potential juror names and in consideration of concerns regarding juror safety raised during and after the trial, we use pseudonyms for the jurors and potential jurors in this case.

innocence for anyone. I just wish that what happened, that we know for sure never happened, so I was never in this courtroom. But what I . . . struggle with is, I'd rather my life not be interrupted. I'd rather be only thinking about what I have to do at work today and the plans that I have at the end of June. But then there's another side of me that understands [] something tragic really did happen. And if this is the course for justice to be served, a part of me just wants to see that happen.

So the law is the law, and whatever is decided, I would hope that the punishment fits the crime. I would hope that the Defense would be confident in doing their job, that they can present their case to where they believe what they're doing is going to help their Defendant, and I would hope that the Prosecution is confident in that they can present their case, that justice would be served one way or another. And then whomever has to decide, decides the right thing. But it weighs heavily on me when just thinking that we might be part of this process. So the short answer is neither one of those penalties do I object to.

[THE STATE]: Okay. Well, I guess are your -- I believe the terms you used [were] you have reservations about the death penalty. And would your feelings about that be such -- are your feelings such that you could not under any circumstance vote for a death sentence?

[R.D.]: Well, it's not that I couldn't. I hoped to never put myself in a position where I'm on the other side of one of those tables. But my point is, if that's what the law requires, then that's what the law requires.

[THE STATE]: I guess --

[R.D.]: My reservation is, I don't want to see anybody die. That's my reservation.

[THE STATE]: I understand. Well, basically the trial would be divided into two parts. The first part would be one determining guilt or innocence on the charge --

particularly on the charge of first degree murder. There are other charges the jury would also consider. But as far as the penalty goes, the only one that potentially would go to a second phase would be the charge of first degree murder. So the first stage in any of this would be the jury would have to consider that. And do your -- again, you have some clearly heart-felt personal feelings about the death penalty. And because of those, would those affect your -- or prevent you from making an impartial decision based on the evidence about the Defendant's guilt in the first part of the trial?

[R.D.]: No.

[THE STATE]: So you think you could sit through that part?

[R.D.]: Certainly.

[THE STATE]: Okay. And if the Defendant is guilty -- found guilty of first degree murder, we would then move into a second or a sentencing phase of the trial. And that phase as well as the first phase, the burden is on the State and that's always proof beyond a reasonable doubt. But in the second phase, the first part of that is the State would produce -- present evidence of what are called aggravating circumstances. And that would be things that would tend to suggest that the appropriate penalty is a death sentence.

[R.D.]: Sure.

[THE STATE]: And again, the jury would have to consider those and find them -- any one of them exists beyond a reasonable doubt. The second part of that, the Defense then would have the ability to present evidence of what are called mitigating circumstances. And again, that would be evidence that would tend to show that the appropriate sentence is one of life in prison. And there the burden is different on the Defense. It's not beyond a reasonable doubt. It's the lower burden of preponderance of the evidence. And in that -- also for the mitigating

circumstances there doesn't have to be unanimity. Any juror who felt like -- particular mitigating circumstance applied, had been proven to themselves could consider that. Whether or not everyone else agreed on that. So the mitigating is more of an individual juror decision.

[R.D.]: Yes, sir.

[THE STATE]: And again, if aggravating circumstances have been found, the next step the jury would be asked to weigh those. And the standard there is -- and the question the jury would have to ask is, are the mitigating circumstances insufficient to outweigh the aggravating circumstances. Which is kind of a backwards question --

[R.D.]: I understand.

[THE STATE]: -- the way it's asked; but basically weighing. And again, that's beyond a reasonable doubt and mitigating insufficient to outweigh the aggravating. And if the jury finds that, then the final question is, are the aggravating circumstances when taken into account the mitigating, are they sufficiently substantial to call for the imposition of a death sentence. And again, that's a beyond a reasonable doubt question as well. And given that -- and that's the framework the jury would have to do that. And in your case -- and again, you're the only one -- and again, you've clearly given a lot of thought to this. There's no question. But if the Defendant was found guilty of first degree murder, would your feelings about the death penalty substantially impair your ability to vote at the sentencing hearing to impose a death sentence no matter what the evidence or aggravating circumstances that were proved?

[R.D.]: No.

[THE STATE]: So you think if the -- if you felt like it was appropriate, you would be able to vote for a death sentence?

[R.D.]: If that's what the law required, yes.

[THE STATE]:  Again --

[R.D.]: I get it.

[THE STATE]: The laws requires --

[R.D.]: I understand nuances.  I'm a [p]astor.  I understand backwards questions, too.  I use them all the time, but I understand what you're saying.

[THE STATE]:  And again --

[R.D.]:  I understand the framework.

[THE STATE]:  The law requires you to consider --

[R.D.]:  Yes.

[THE STATE]:  The law doesn't require a vote one way or the other.  That's a juror's decision about how to vote.
[R.D.]: I would not --

[THE STATE]: You would not --

[R.D.]: I would not have any reservations.

[THE STATE]: Okay.  Likewise, if you felt like the evidence called for it, would you be able to vote for a sentence of life in prison?

[R.D.]: Certainly.

Defendant raised an objection to the State's peremptory strike of R.D. under *Batson v. Kentucky*, which the trial court overruled during the following exchange in open court:

[DEFENDANT]: [] [Y]our Honor, at the appropriate time, we do enter a *Batson* challenge as to Alternate Number

One, [R.D.].

. . . .

Your Honor, in regards to [R.D.], and I tried to be very careful . . . to write down everything that he said. Certainly there was nothing indicated on his questionnaire . . . that indicated that he could not follow the law, that he was not available, that he could not make the time. He certainly hadn't formed any opinions. He understood clearly the presumption of innocence and the reasonable doubt theories that we all deal with. And I was especially struck[ ]when he was asked questions about his views on the death penalty. . . . [O]ne of the reasons why we feel like the District Attorney's peremptory strike against him, that there are some racial undertones to it, because what he said was he didn't want to be here. He didn't want to be in this position. He would do it. And he made the statement that if anybody is familiar with personal statistics, they do show that there are more African Americans that receive the death penalty. But then he went on to say that it was weighing on him. He's a minister. He said he has struggled with his decisions in this. Prefers that his life not be interrupted, but then he said the law is the law and what is decided. The punishment[] fits the crime. And he was confident. . . . . He made that statement. And he also said if the State is confident and can convince him beyond a reasonable doubt, whoever has to decide will make the right decision. He made it very clear that he . . . wasn't predisposed to either penalty. That he could consider each one. That there wasn't either penalty that he objected to. He didn't want to see anyone die but that he could do it. He's, in our opinion, the perfect juror. Not only is he rational and intelligent and thoughtful in his answers[,] . . . . [b]ut he is what we would call the perfect juror for a death-qualified jury, and that is somebody who has made it very clear that he can consider both sides[.] . . . [W]ith everybody else that they have accepted, we can find the only reason that they would want to kick [R.D.] off is because he is an African American man and because he did happen to make that statement which is a true statement.

That the death penalty is more often than not applied to African Americans if you look to see who is on our death row.

. . . .

I think obvious to all of us as we have received the past three jury pools that these pools are woefully lacking in diversity. I counted in this particular pool that we got today . . . [and] we had a total of 89 people . . . in this pool. And five of them were African American and then two of them were released for cause. In the other two pools, it has been similar to that, and that is . . . not a cross section of this community. I don't know why that is. . . . I haven't done statistical studies. I don't know why that is that our jury pools in Buncombe County are so obviously lacking in diversity.

But I think given that, the fact that we have had the opportunity to speak to one African American juror and that gentleman is on our jury now, we haven't had any opportunity to question any other African Americans until [R.D.] came in. And I think that is something to be considered as well. The fact that our client has[] . . a Sixth Amendment right to a fair trial. He has a right under . . . the Sixth and the Eighth Amendment and due process to be judged by . . . a cross section of the community. And although I think we . . . worked hard to do that, and we certainly have been able to obtain one African American juror who is appropriate for death-qualified jury, we have not had the opportunity to question anybody else until [R.D.]. And I think that also needs to be considered in whether or not the State should be allowed to strike what may well be the only other African American potential juror that we'll have a chance to talk to in this case. I don't . . . know that we have any more. I think we might have one somewhere. So we would ask that you take that into consideration as well.

THE COURT: Okay. Thank you. The issue for the Court to determine under *Batson* . . . is, first, whether or not the

party making the *Batson* claim has made a sufficient showing that the other party exercised appropriate challenge on the basis of race or sex. I'm looking at *State v. Smith*, 351 [N.C.] 251 [2000]. The Court will take the following matters into consideration to determine whether or not the prima facie showing has been taken by the Defendant.

First, []my recollection is that . . . the State has exercised no peremptory challenges as to any previous African American juror. There was a previous African American juror that was excused by cause but that was with the consent of [] Defendant. . . . [T]he Court did not observe any racially motivated questions by the State. . . . [R.D.] did make the statement about the death penalty . . . [being] disproportionately given to African Americans. . . . . So it is a low standard. Lower than a preponderance as shown by our evidence for the initial threshold showing.

Based upon that statement, the Court is going to find a prima facie showing and then turn to the State for any neutral justification. So . . . I'll recognize the State at this point.

[THE STATE]: Well, first of all, I would -- I think I would object to [the] finding of a prima facie case, your Honor. I don't think there has been a showing of that. I particularly think the part about the jury pool, given that Buncombe County is only six or seven percent African American, the numbers that they cited regarding the jury pool would not be particularly out of order given Buncombe County's overall population.

However, as far as a reason for the strike of [R.D.] is he did express reservations about the death penalty. He was very clear about that. He had thought about it and had reservations about it and its application. Just like the juror next to him, [M.K.]. She also expressed rather [] different reservations about the death penalty, but she expressed them as well. And that would be the State's reason for striking him are the reservations he expressed about the

death penalty, your Honor.

. . . .

And . . . I don't think the reasoning behind is reservations, your Honor, is relevant. The fac[t] is he expressed reservations about the death penalty.

THE COURT: All right. Thank you. [Defendant]?

[DEFENDANT]: Well, your Honor, I . . . was very careful to write down what [R.D.] was saying, because what I recall happening is he made it very clear when he said the punishment should fit the crime. That . . . he wasn't predisposed to either sentence; and, in fact, I think what the record would show is that it was at that point that [the State] asked him the questions that you would normally ask of somebody that says, I don't think I can consider the death penalty. And, in fact, I think those questions were an attempt to lead [R.D.] to some different conclusion other than that which he had already given in a very sincere and genuine way, and that is that it would be very difficult for him. The law is the law. Whatever is decided, punishment fits the crime. He'd listen [to] what the Defendant presents. He[] . . . hopes that the State is confident in their case. And whomever has to decide it will make the right decision. Then he clearly said, neither penalty do I object to. I don't want to see anyone die he said. There's nothing about that that suggests that he had any reservations about the death penalty. If that's the reason that the State is giving.

THE COURT: All right. Thank you. . . . [F]or purposes of the *Batson* hearing, the Court would find that . . . under the low threshold, the Court found a prima facie showing. [The] State has now provided the justification indicating that he expressed reservations about the death penalty. I wrote down, quote, I have reservations. It is correct[,] as [Defendant] indicated[,] that he did indicate that he could consider both punishments. [The] Court does consider, again, as I indicated earlier[,] that the State has exercised

no peremptory challenges as to any previous African American juror. The one . . . African American juror that was called to the panel and excused was excused by cause and that was consented to by the Defense and that was a situation in which she was related to some of the parties involved. So that was not a peremptory challenge. That was a challenge for cause.

Again, no racially-motivated questions were asked. [The] State has used at this point what would be . . . 16 previous peremptory challenges. . . . 15 of which . . . involved white jurors. And again, he did express reservations about the death penalty.

The Court would find based upon the evidence presented that there has not been a sufficient showing that the juror's race was a significant or motivating factor in striking [R.D.]. And so the *Batson* challenge is respectfully denied.

No further *Batson* issues were raised during jury selection.

While trial was ongoing, one of the State's witnesses was killed, and the Buncombe County District Attorney issued a press release identifying the victim by her involvement in the case. The release stated, in pertinent part, that the trial court had "issued appropriate orders to protect individuals who are involved with the trial to ensure proceedings may safely continue." One of the jurors learned of the press release and was excused for cause. Defendant moved for a mistrial, and the trial court denied the motion.

Two days after the jury reached its verdict, Defendant became aware that another juror had learned of the murder of the State's witness, and Defendant moved once again for a mistrial. The trial court conducted a hearing on the matter and ruled

that, in light of the juror having communicated to the bailiff that learning of the news did not personally concern him, the juror's failure to report his having obtained the information to the court had "not resulted in substantial or irreparable prejudice to [Defendant's] case[.]" The trial court also denied this motion for mistrial.

## ANALYSIS

On appeal, Defendant argues (A) the trial court erred in overruling his *Batson* challenge; (B) the trial court abused its discretion in not granting his motions for mistrial; and (C) the trial court erred in not recusing from Defendant's final motion for mistrial, allegedly because the resolution of the motion "hinged on [the trial judge's] own testimony."[3] For the reasons stated below, we hold the trial court did not err.

### A. *Batson*

First, Defendant argues the trial court erred in denying his *Batson* objection. Under *Batson v. Kentucky*,

> a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show . . .

---

[3] Defendant has also sought an *in camera* review of the sealed personnel records of an officer testifying in the case. *See State v. Hardy*, 293 N.C. 105, 128 (1977) ("[I]f the [trial] judge, after the *in camera* examination [of allegedly exculpatory evidence], rules against [a] defendant on his motion, the judge should order the sealed statement placed in the record for appellate review."). However, we have reviewed the personnel records in question and have identified nothing that would be both material and favorable to Defendant. *See State v. Sheffield*, 282 N.C. App. 667, 684-85, *disc. rev. denied*, 382 N.C. 328 (2022) (separately analyzing materiality and favorability). The trial court, therefore, did not err in its *in camera* review of the sealed personnel records.

that the prosecutor has exercised peremptory challenges to remove [members] from the venire [on the basis of] race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

. . . .

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging [jurors of the excluded class].

*Batson v. Kentucky*, 476 U.S. 79, 96, 97 (1986) (marks and citations omitted). Thus, a *Batson* analysis consists of three steps: "First, the defendant must make a prima facie showing that the [S]tate exercised a race-based peremptory challenge." *State v. Taylor*, 362 N.C. 514, 527 (2008). Second, "[i]f the defendant makes the requisite showing, the burden shifts to the [S]tate to offer a facially valid, race-neutral explanation for the peremptory challenge." *Id.* "Finally, the trial court must decide whether the defendant has proved purposeful discrimination." *Id.*

In *State v. Hobbs*, our Supreme Court clarified the procedural requirements applicable to a *Batson* analysis. It emphasized that, "when a defendant presents evidence raising an inference of discrimination, a trial court, and a reviewing appellate court, must consider that evidence in determining whether the defendant has proved purposeful discrimination in the State's use of a peremptory challenge."

*State v. Hobbs*, 374 N.C. 345, 356 (2020).  It then reiterated the U.S. Supreme Court's

holding that

> [a] criminal defendant may rely on a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race.  This evidence includes, but is not limited to:
>
> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

*Id.* (marks and citation omitted) (citing *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243

(2019)).

Here, Defendant argues on appeal that the trial court erred in its *Batson* ruling

because the State's reason for striking R.D.—reservations about the death penalty—

was pretextual.  In support of this argument, Defendant argues that two similarly

situated white jurors gave similar answers to Defendant and were not stricken by the

State; that the State, in addition to striking R.D., struck prospective jurors who expressed concerns relating to race; that the State's strike rate was suspect, especially in light of historic statistical trends in North Carolina strike rates by race in capital trials; and that the racial makeup of the jury pool rendered this case susceptible to racial discrimination.

As the trial court explicitly issued its ruling at the third step of *Batson*, we review its determination for clear error. *Foster v. Chatman*, 578 U.S. 488, 500 (2016) (marks omitted) ("*Batson*'s third step[] . . . turns on factual determinations, and, in the absence of exceptional circumstances, we defer to [trial] court factual findings unless we conclude that they are clearly erroneous."). However, before conducting our ultimate analysis, we must address two threshold issues.

**1. Scope of Defendant's Argument on Appeal**

First, several of Defendant's arguments on appeal were not actually before the trial court during the *Batson* hearing. The whole of Defendant's argument before the trial court, reproduced in relevant part above, concerned R.D.'s willingness to impose the death penalty if legally warranted, the fact that R.D.'s misgivings about the death penalty arose from his concerns about its racially disparate rate of application, the overall lack of diversity in Buncombe County's jury pools, the fact that R.D. was one of only two African American prospective jurors at the time the State struck him, and the State's inappropriately having pursued a line of inquiry with R.D. that is typically pursued only with jurors who have expressed an inability to impose the death

penalty. Beyond these arguments, the trial court also considered, on its own initiative, whether the State asked R.D. "racially motivated" questions. At no point during trial did Defendant raise arguments concerning any comparable answers by white jurors, nor did Defendant discuss the striking of jurors of other races who voiced concerns pertaining to race, as he does now on appeal.

Defendant and the State disagree as to the proper scope of appellate review, and sources conflict as to whether and to what extent a defendant may make additional *Batson* arguments on appeal. At face value, the traditional emphasis on the Defendant's burden at step three of *Batson* should operate to limit the scope of available arguments on appeal to what was actually argued at trial. *Batson*, 476 U.S. at 93 (marks omitted) ("[T]he burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination."); *see also State v. Bennett*, 282 N.C. App. 585, 601 (citing N.C. R. App. P. 10(a)(1)) (remarking, with respect to a *Batson* argument, that "a defendant must (1) raise the issue below and (2) argue the same theory below."), *appeal dismissed, review denied*, 383 N.C. 694 (2022). Moreover, even in *State v. Hobbs*, which emphasized that "a trial court, and a reviewing appellate court, must consider [all of a defendant's] evidence in determining whether the defendant has proved purposeful discrimination[,]" the scope of the requirement was limited to instances "when a defendant presents evidence raising an inference of discrimination[.]" *Hobbs*, 374 N.C. at 356; *see also State v. Clegg*, 380 N.C. 127, 149-50 (describing step three of

*Batson* as the trial court "weigh[ing] all of the reasoning from both sides").

Nonetheless, both our Supreme Court and the U.S. Supreme Court have cautioned that, "'in reviewing a ruling claimed to be *Batson* error, *all* of the circumstances that bear upon the issue of racial animosity must be consulted.'" *State v. Waring*, 364 N.C. 443, 475 (2010) (emphasis added) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)), *cert. denied*, 565 U.S. 832 (2011); *see also Flowers*, 139 S. Ct. at 2243 (emphasis added) ("The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, *and* in light of the arguments of the parties."). Thus, while the holding in *Hobbs* creates an affirmative duty to weigh *at least* the evidence put forth by Defendant during the *Batson* hearing at trial, *see Hobbs*, 374 N.C. at 356, we understand the proper scope of our review on appeal to include all relevant information in the Record at the time, regardless of whether Defendant's arguments at trial specifically invoked that information.[4] This approach comports with that used by the U.S. Supreme Court.

---

[4] This further highlights an emergent distinction in our caselaw between substantively correct *Batson* analyses—analyses that correctly answer whether the State purposefully discriminated based on race—and procedurally correct *Batson* analyses—analyses that adequately addresses a defendant's *Batson* arguments at step one and three. A *Batson* proceeding, even if substantively correct, may be procedurally deficient if either we or the trial court fail to adequately address a defendant's arguments. *Compare Hobbs*, 374 N.C. at 360 (reversing and remanding to the trial court at *Batson's* third step, in part, for "failing to engage in a comparative juror analysis of the prospective juror's voir dire responses and failing to consider the historical evidence of discrimination that [the defendant] raised") *with State v. Hobbs*, 384 N.C. 144, 156-57 (2023) (holding, in the same case, that the trial court did not clearly err in its substantive *Batson* ruling). Thus, under *Hobbs*, a *Batson* ruling may be overturned on appeal on substantive grounds for any reason clear from the Record at the time of the ruling; however, *Batson* analyses are only *procedurally* deficient if they fail to respond to a defendant's arguments.

*Miller-El v. Dretke*, 545 U.S. 231, 240-44 (2005) (conducting a comparative juror analysis on appeal not used before the trial court).

This analysis also mirrors the scope of review applied to clear error in our First Amendment jurisprudence. "In cases raising First Amendment issues[,] an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *State v. Taylor*, 379 N.C. 589, 608 (2021) (marks omitted) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)). This whole record review "does not empower an appellate court to ignore a trial court's factual determinations[,]" *id.*; rather, the underlying "credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the opportunity to observe the demeanor of the witnesses[.]" *Desmond v. News & Observer Publ'g Co.*, 375 N.C. 21, 43 (2020) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 689 (1989)). This whole record review does not necessarily require a detailed written exploration of all salient features of a record, only that such a review have actually occurred.[5] *E.g. Mitchell v. Univ. of N.C. Bd. of Governors*, 288 N.C. App. 232, 242-43 (2023). Our *Batson* analysis, therefore, is not

---

[5] This scope of review also, we think, best suits both the practical and substantive needs of our justice system, balancing the paramount importance of ensuring that racial discrimination not occur in North Carolina's jury pools with the need to avoid the systemic inefficiency that would result from a written analysis spanning the entire Record in every case on appeal. *Batson v. Kentucky*, 476 U.S. at 99 (1986) ("[P]ublic respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race.").

only consistent with the existing *Batson* caselaw, but also mirrored elsewhere in our State's constitutional clear error jurisprudence.

For these reasons, we base our analysis on a review of the whole record, engaging in a full, written analysis of all arguments raised by Defendant at trial, as required by *Hobbs*. *Hobbs*, 374 N.C. at 356. We also, for methodological clarity, address in writing most[6] arguments Defendant raises for the first time on appeal; those arguments, while not encompassed under the procedural command of *Hobbs*, still factor into our review of the whole record.

**2. Race and Views About Race**

Defendant has made two arguments pertaining to stricken jurors "who expressed concern about racial disparities"—one as to R.D. and another as to three white prospective jurors. Thus, as a second threshold issue, we devote this section of the opinion to clarifying whether and to what extent these arguments factor into our analysis.

Our Supreme Court has made clear that, at step three of *Batson*,

> "[t]he ultimate inquiry is whether the State was motivated in substantial part by discriminatory intent." *Flowers*, 139 S. Ct. at 2244 (cleaned up). Thus, "[n]o matter how closely tied or significantly correlated to race the explanation for a peremptory strike may be, the strike does not implicate the Equal Protection Clause unless it is based on race." *Hernandez* [*v. New York*, 500 U.S. 352, 375 (1991)]

---

[6] We do not include Defendant's evidence and arguments pertaining to death penalty statistics by race in North Carolina in our analysis because, as Defendant concedes, this evidence was not in the record before the trial court at the time of the *Batson* hearing.

(O'Connor, J., concurring).

*State v. Campbell*, 384 N.C. 126, 135 (2023). In other words, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 134-35 (citing *Hernandez*, 500 U.S. at 360).

Race, for all the discussion devoted to it in the legal field and beyond, naturally generates a variety of viewpoints as to the nature and extent of its significance, as well as what norms and policies ought to be adopted surrounding it. *Cf. Mitchell*, 288 N.C. App. at 246 (Murphy, J., concurring in part and dissenting in part) (citing Kevin Laland, *Racism in academia, and why the 'little things' matter*, Nature (Aug. 25, 2020), https://www.nature.com/articles/d41586-020-02471-6; John McWhorter, *Words Have Lost Their Common Meaning*, The Atlantic (Mar. 31, 2021), https://www.theatlantic.com/ideas/archive/2021/03/nation-divided-language/618461/; Yuvraj Joshi, *Racial Transition*, 98 Wash. U. L. Rev. 1181, 1203-1208 (2021)) ("Copious amounts of ink have been spilled over what the significance of race in academia should be, what constitutes racism, and how to solve the myriad of problems it poses."). Just as naturally, we would not expect—nor is it in fact the case—that all members of a given racial group subscribe to the same views about race or that a particular view about race canonically expresses the interests of any given group. For this reason, a peremptory strike employed on the basis of a stricken juror's views about race, standing alone, will not itself establish a violation of *Batson*, "[n]o matter how closely tied . . . to race th[at] explanation for a peremptory strike may be,"

topically speaking. *Campbell*, 384 N.C. at 135 (citing *Hernandez*, 500 U.S. at 375).

Nonetheless, just as views about race are not identical with race, they are also not fully separable from an inquiry—taking "all of the circumstances that bear upon the issue of racial animosity" into account—as to whether a strike had been used with discriminatory intent. *Waring*, 364 N.C. at 475. After all, if the State were of a mind to strike a juror based on his or her race, the same discriminatory animus that motivated a strike based on race would also tend to motivate strikes of jurors espousing a special sympathy for that racial group, especially in a case where the race of the stricken juror and the race of the defendant align. Put differently, while it is not, in fact, the case that discrimination based on race and discrimination based on views about race are the same for *Batson* analysis purposes, the two would run closely enough together in the mind of the discriminator that a racial-views-based strike can operate as a "plus factor" with respect to an allegedly race-based strike.

Accordingly, to the extent Defendant alleges the strike of juror R.D. having been based on his views about race would amount to a strike based on race, we reject that argument. However, to the extent Defendant offers R.D.'s views about race and the views of the three stricken white jurors as context to support an allegation that the strike of R.D. was pretextual, we consider his argument for that limited purpose.

### 3. *Batson* Analysis

Turning to the merits, Defendant argues that the State's proffered race-neutral reasons for its strike—reservations about the death penalty—was pretextual for the

following reasons: first, juror R.D. did not actually express an inability to impose the death penalty, yet he was asked questions similar to those asked of jurors who expressed an inability to do so; second, the State accepted similarly situated white jurors, J.C. and C.D., who also expressed reservations about the death penalty; third, the State used peremptory strikes on jurors X.I., D.F., and B.M., "who expressed race-based concerns"; and, finally, the jury pool being almost entirely white rendered this case more susceptible to racial discrimination. Meanwhile, in addition to disputing Defendant's arguments, the State points us to the fact that both Defendant and the alleged victims were African American and directs our attention to another white juror it struck, M.K., who was allegedly similar to R.D.

The voir dire responses of J.C., which Defendant alleges demonstrated similar reservations about the death penalty to R.D., were as follows:

> [THE STATE]: As you're aware the one we're trying is charged with first degree murder, and the two possible penalties for first degree murder are life in prison or a death sentence. And with that in mind, do you have any moral, philosophical, or religious beliefs or opinions against the death penalty?
>
> [J.C.]: No, sir.
>
> [THE STATE]: So no particularly strong belief one way or the other?
>
> [J.C.]: No, sir.
>
> [THE STATE]: Okay. So if -- in light of that, under the evidence that was produced, if you thought that a death

sentence was the appropriate punishment you would be able to vote for that?

[J.C.]: Yes.

[THE STATE]: And likewise, if you thought a sentence of life in prison was appropriate, you would be able to vote for that?

[J.C.]: Yes, sir.

. . . .

[THE STATE:] [I]f the Defendant was found guilty of first degree murder, would your feelings about the death penalty substantially impair your ability at the sentencing hearing to impose a death sentence no matter what the evidence was?

[J.C.]: Yes.

[THE STATE]: So you think that your feelings about the death penalty might cause a problem?

[J.C.]: Yes.

[THE STATE]: All right. And what are those feelings you have about --

[J.C.]: Just the way we was brought up as a family, you do not take a life.

[THE STATE]: Okay. So the way you were brought up, do not take a life, think that would affect your ability to sit and consider whether or not to impose a death sentence?

[J.C.]: It could.

[THE STATE]: And are those feelings so strong that you don't think under any circumstance you could vote for a death sentence?

[J.C.]: No, not that I can -- I don't think so. I'd have to know what the circumstances were.

[THE STATE]: Okay. So then what you're telling me is there might be circumstances that you felt were sufficient to call for a death sentence but you would -- that wouldn't be your first inclination?

[J.C.]: Right.

[THE STATE]: And would you be able to keep an open and fair and impartial mind about those issues until you've heard all the evidence and Judge Horne has instructed you about the law?

[J.C.]: I hope I could.

[THE STATE]: I guess the bottomline question then is, and again, not sort of an academic one. In this it's a very direct question. If you thought the evidence called for it, could you walk in here and tell the Court that you voted for death?

[J.C.]: Yes, sir.

The responses of C.D., which Defendant offers for the same purpose, were as follows:

[THE STATE]: Do you have any moral or religious objections to or opinions against the death penalty?

[C.D.]: I don't really like the death penalty, but I would be willing to give my vote whether or not the evidence provided that the person was guilty or not.

. . . .

[THE STATE]: And is that belief that you have, that opinion that you don't like the death penalty, is that strong enough that it would keep you under any circumstances from voting for a sentence of death?

[C.D.]:  No, it wouldn't impede my decision.

. . . .

[THE STATE]:  So you -- despite not really, as you put it, not really liking the death penalty, you think under some circumstances at least you would be able to vote in favor of a sentence of death?

[C.D.]:  If he was guilty, yes.

[THE STATE]:  Well, if he's guilty, then you also realize that you would be obligated to weigh both the sentence of life in prison and the death sentence.

[C.D.]:  Yes.

[THE STATE]:  You could consider both?

[C.D.]:  Yes.

[THE STATE]:  And would you be able to go through that process of hearing about aggravating circumstances and mitigating circumstances and weigh those?

[C.D.]:  Yes.

[THE STATE]:  And if you felt like that the appropriate sentence was one of -- was a death sentence, would you be able to vote for that?

[C.D.]:  Yes.

[THE STATE]:  Would you be able to walk back into court and announce that that was your verdict?

[C.D.]:  Yes.

[THE STATE]:  Similarly, if you felt like the appropriate sentence was one of life in prison, would you be able to vote that?

[C.D.]:  Yes.

[THE STATE]:  And would you be able to walk back here in court and announce that that was your verdict?

[C.D.]:  Yes.

When asked whether she could render a verdict free of racial bias, X.I. affirmatively brought up the scarcity of African Americans on the jury, and D.F. agreed:

[X.I.:]  I thought it was odd that so far it looked like all the people you had to choose from were Caucasians, so I thought that was odd.

[D.F.]:  I thought that, too.

[X.I.]:  I was concerned you wouldn't end up having any African Americans on your jury.

[THE STATE]:  Well, obviously, that is an issue in today's world.

[X.I.]:  You can only have what you call in, so I was concerned.

[THE STATE]:  And again, that's why it's important to get these issues out.

The State eventually exercised peremptory strikes against both D.F. and X.I., though D.F.'s strike occurred only after she reported that Defendant waved at her.

Later during voir dire, B.M., in response to a similar question about rendering a verdict free of racial bias, made the following remark:

> [B.M.:] I [] think it's going to be challenging because he's African American; and basically everybody in here except for those sitting out in the gallery are not; and so I can't presume to understand his background at all. And so yes -- so that adheres to it. I'm not one who has this color blind mind set. I fully am aware of my status and my privilege and who I am as far as my race.

The State exercised a peremptory strike against B.M.

Finally, the State argues another allegedly similar white prospective juror that it struck during voir dire, M.K., was similar to R.D.:

> [THE STATE:] [M.K.], do you have any moral, philosophical, religious beliefs or opinions against the death penalty?
>
> [M.K.]: I'm a homeschooling mother, and I raised my children -- we did Government. Don't ask me anything about it now. But I raised them to understand that our laws are placed here by God and that we honor them and also that everyone of you are in here appointed by God.
>
> [THE STATE]: I'm sorry, I didn't hear what you said.
>
> [M.K.]: That everybody in here is appointed in authority by God, and my children are to do the right thing, whatever it is. I don't -- I don't like -- I don't think about the death penalty. I just have to be honest. But I do read a lot in scripture and different things. I know how God set up things. I know he has grace and mercy. But I also know he has justice before he can even extend mercy. I can't say that I have a problem with the death penalty. We're all under a death penalty eventually anyway. But for me to play that part, I would have to know in my heart beyond a shadow of a doubt that that really is what the answer

should be.  I have to know from what you-all are saying that's something that should be put in place or not put in place.  I can't make a decision.  I'm not quite sure -- I don't have a problem -- I do have a problem.  Like I can't imagine somebody not having a problem with it.  But I just have to hear everything, you know.

[THE STATE]:  Okay.  Well, obviously this is a very -- it's a very serious question, and I think no one would do any of this lightly.

[M.K.]:  Yeah.  If I had to, I would.  If I really, really felt strong, but I would have to really feel strong about it.

[THE STATE]: Okay?

[M.K.]: I can't -- I can't imagine.

[THE STATE]: Okay.

[M.K.]:  Have to think about this issue.

[THE STATE]: So are your feelings -- let's see.  Are your beliefs such that you think under some circumstances you could vote in favor of a death sentence?

[M.K.]:  It would have to be a very extreme one.

[THE STATE]:  Okay.  But under a very extreme case, you think you would be able to -- your beliefs aren't so strong that under no circumstance then would you be able to vote in favor of a death sentence?

[M.K.]:  No, my belief -- no.

[THE STATE]:  You would under -- I believe as you put it, extreme circumstances, you would be able to vote for such a thing -- for a death sentence?

[M.K.]:  Yeah, it would have to be proven extreme for me.

[THE STATE]: Okay. And do you think because of these strong personal feelings you have you would already be predisposed to vote for a sentence of life in prison?

[M.K.]: I have no -- no.

[THE STATE]: So you would come in -- again, be able to --

[M.K.]: I don't know what is going on with any of this stuff, and I have no agenda in my mind.

[THE STATE]: Okay. Would your attitude toward the death penalty prevent you from making an impartial decision based on the evidence about the Defendant's guilt in the first part of the trial?

[M.K.]: My attitude -- you know, I just really would be seeking the Lord the whole time. I mean I have to -- I don't -- I don't think so.

[THE STATE]: Okay. So you think as far as that first part where it's not about the sentencing, it's just about whether the Defendant is guilty or innocent of first degree murder.

[M.K.]: Yeah, that's --

[THE STATE]: I mean that's still obviously a very serious decision.

[M.K.]: Yes, it is.

[THE STATE]: Do you think you would be able to -- as a juror be able to do that part, carry forward that part of your duties?

[M.K.]: I think I -- you know, if I can get out of this, I will. You know that. But I think I could make a decision.

[THE STATE]: Okay. When I was going through with [R.D.] the process then if the Defendant is found guilty of first degree murder, the process of the aggravating

circumstances and the mitigating and the weighing. Were you able to listen to that?

[M.K.]: Yeah.

[THE STATE]: And again, I know this isn't stuff you normally sit around thinking about.

[M.K.]: No, I don't.

[THE STATE]: These are very difficult questions. And if the Defendant was found guilty of first degree murder, would your feelings about the death penalty substantially impair your ability to vote at the sentencing hearing to impose a death sentence no matter what the evidence or aggravating circumstances that were proved?

[M.K.]: Okay. Say that one more time, because it's heavy.

[THE STATE]: Yes. If the Defendant was found guilty of first degree murder, would your feelings about the death penalty substantially impair your ability to vote in the sentencing hearing to impose a death sentence no matter what the evidence or aggravating circumstances that were proved?

[M.K.]: I'm trying to understand the last part of what you're saying. I don't -- simply put --

[THE STATE]: Simply put, are your feelings about the death penalty so strong that they would impair your ability no matter what the State proved as far as -- what made this aggravating. No matter what we proved, would your feelings --

[M.K.]: About the death penalty?

[THE STATE]: About the death penalty --

[M.K.]: Override what --

[THE STATE]: Substantially impair your ability to vote for a death sentence no matter what the evidence was?

[M.K.]: I don't -- you know what, I think I'm not your person, but I don't think -- I've never been in that position. I just don't think I'm your person. I don't believe that I would be impartial or partial. I just want to know the truth, if I'm responsible for something. I don't think about the death penalty like I don't think about life imprisonment. I don't think about that stuff. I will just -- when things are presented, that's when I'll look at it and decide what goes on in my -- you know, from what I'm seeing, from what you're proving. I don't know if that helps you or not, but I don't know all your legal jargon. But I don't think I would object be -- in my own words, I don't feel like I would be impartial. I just think I would do whatever I really felt was the right thing to do.

[THE STATE]: Okay. Well --

[M.K.]: But if you don't want me, that's okay.

[THE STATE]: I understand. Kind of strip it down as -- the question down as much as I can.

[M.K.]: Okay.

[THE STATE]: If you thought the evidence called for it --

[M.K.]: Yes.

[THE STATE]: -- could you walk in here and tell the Court that you had voted for death?

[M.K.]: If I thought the evidence called for death, would I say that? Is that what you're saying?

[THE STATE]: Could you vote for it --

[M.K.]: Yes.

[THE STATE]: -- and walk in and say you voted for it?

[M.K.]:  Yes, if I felt that that called for that, yes.

[THE STATE]:  Likewise, if you felt like the evidence called
for a sentence of life in prison, could you --

[M.K.]:  If I felt that, yes.

The State exercised a peremptory strike against M.K., doing so at the same time as it struck R.D.

On this Record, we cannot say the trial court clearly erred in denying Defendant's objection at the third step of *Batson*, though the case is close.  *See Foster*, 578 U.S. at 500.  At the outset, the percentage-based strike rate analysis proffered by Defendant is completely indeterminate, with only two African American jurors having remained in the jury pool after removals for cause; a fifty-percent strike rate means almost nothing when that fifty percent represents only a single person. Similarly, the relative scarcity of African Americans in the jury pool, while perhaps a problematic phenomenon for racial equity in the justice system in general, is the product of circumstances outside the State's control in its prosecutorial capacity.  This factor therefore plays no role in our determination of whether Defendant has demonstrated "purposeful discrimination" on the part of the State.  *Taylor*, 362 N.C. at 527.

As often happens in *Batson* inquiries, the more compelling evidence in this case is the relative treatment of prospective juror R.D. and white jurors who expressed

reservations about the death penalty. *See Miller-El*, 545 U.S. at 241 ("More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve."). Comparing the responses of J.C., C.D., and M.K. to those of R.D., we note that R.D. shares the most relevant features with M.K. In expressing their respective initial thoughts about the death penalty, R.D. and M.K. both wavered in their feelings about its application, albeit under different rationales—R.D. was concerned primarily about racial disparities in application, while M.K. couched her thoughts in terms of religious introspection. R.D. and M.K. were also questioned sequentially, minimizing the likelihood that simple variables like the passage of time or differences in levels of fatigue on the part of the State affected the comparability of the outcomes. Finally, R.D. and M.K. both suffered some degree of miscommunication with the State during questioning that may have undermined the State's confidence in the juror's answers, with R.D. interrupting the State during its explanation of forthcoming procedures and M.K. indicating she did not understand what the State was saying.

Despite these similarities, there was more reason for the State to doubt M.K.'s ability to serve as a death-qualified juror than R.D. As stated above, though both jurors suffered a degree of miscommunication with the State, only M.K. suffered that miscommunication as a result of failure to comprehend the State. R.D., by contrast, expressed a confidence and straightforwardness in his responses more comparable to J.C. and C.D.—whom the State did *not* strike—than M.K. Notwithstanding that

difference in demeanor, the State took pains to attempt to rehabilitate M.K. that it did not with R.D., continuing to clarify and reframe its questions concerning her ability to serve on the jury even after she directly stated "I'm not your person[.]" And a similar interaction occurred with J.C., whom the State rehabilitated and accepted even after he expressed plainly that he could not vote for the death penalty. R.D. made no comparable remarks.

However, despite this possible contrast in the State's treatment of the venire members, we still cannot say that the trial court clearly erred in its determination that the State permissibly struck R.D. First, as stated previously, the sample size of African Americans in the jury pool was so small that it would have been impossible to extrapolate a meaningful pattern from the State's treatment of African American jurors as opposed to jurors of other races. R.D. was the only African American juror against whom the State exercised a peremptory strike, and the only other African American venireman questioned at the time of the *Batson* hearing was accepted without issue and subject to no irregular questioning patterns. Second, despite the potentially unfavorable treatment of R.D. by the State relative to other jurors who expressed reservations about the death penalty, the fact remains that the manner and reasoning with which R.D. expressed those reservations were unique, with no other allegedly similar juror expressing substantively comparable thoughts. On this Record, considering whether the State's explanation was pretextual, we are not "left with the definite and firm conviction that a mistake ha[d] been committed" by the

trial court in overruling Defendant's objection. *Clegg*, 380 N.C. at 141.

Finally, applying the clearly erroneous standard, we are no less confident in this conclusion in light of the State's pattern of striking jurors who expressed concerns relating to race. If anything, without evidence of racially discriminatory intent elsewhere in the State's striking or questioning patterns, the consistency with which the State struck potential jurors who volunteered their views about issues of race—three out of four of whom were white—suggests that the State exercised a peremptory strike against R.D. because it was uniquely averse to the reason he gave for his reservations about the death penalty, not because R.D. is African American. We cannot be confident the trial court was mistaken in its conclusion that reservations about the death penalty explained the exercise of the State's strike of R.D., *see id.*, and we therefore hold the trial court did not err with respect to Defendant's *Batson* challenge.

## B. Motions for Mistrial

Defendant next argues the trial court abused its discretion by denying his motions for mistrial. "This Court reviews a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. McDougald*, 2021-NCCOA-424, ¶ 7, 279 N.C. App. 25, 27 (2021). "The decision of the trial judge is entitled to great deference since he is in a far better position than an appellate court to determine whether the degree of influence on the jury was irreparable." *State v. Williamson*, 333 N.C. 128, 138 (1992).

Here, the trial court did not abuse its discretion in denying Defendant's mistrial motions. The trial court found there was "not evidence before [it] at [that] time . . . that there [had] been and [was] substantial and irreparable prejudice to [Defendant's] case in that [there was] no evidence before [it] that the 12 jurors or the alternate ha[d] any knowledge at th[at] point." Moreover, the transcript demonstrates that, when the Buncombe County District Attorney's press release concerning the death of the State's witness was brought to the trial court's attention, "no impaneled juror indicated they had knowledge of [the] death"; that, "[a]t that point, the [R]ecord d[id] not indicate that any other jurors said they were aware of [the] death or had viewed any media reports related to it or this case"; that the juror who became aware of the press release "stated no other jurors had said anything to him about having any concerns about their safety or being afraid"; and that the trial court issued a curative instruction regarding the use of cell phones after another juror sent a text message to the clerk during trial about information he inadvertently learned.

Based on this Record, we cannot conclude that the trial court abused its discretion in denying these mistrial motions. Defendant has not offered any evidence or arguments that overcome the fact, as found by the trial court, that none of the impaneled jurors knew about the District Attorney's press release when the court considered Defendant's first mistrial motion. When the second mistrial motion was heard—occurring only after deliberations finished and the verdict was announced—

the trial court was in the best position to gauge the veracity of the juror who used his cell phone and only inadvertently saw a headline, not the full details of an independent news broadcast, and unequivocally denied that the information regarding the death of the State's witness impaired his ability to be fair and impartial. These facts do not rise to the level of an abuse of discretion.

## C. Recusal

Finally, Defendant argues the trial court erred by conducting a hearing on his final motion for mistrial itself. N.C.G.S. § 15A-1223(e) provides that "[a] judge must disqualify himself from presiding over a criminal trial or proceeding if he is a witness for or against one of the parties in the case." N.C.G.S. § 15A-1223(e) (2021). A defendant must prove "objectively that grounds for disqualification actually exist" and "show substantial evidence that there exists such a personal bias, prejudice or interest on the part of the judge that he would be unable to rule impartially." *State v. Fie*, 320 N.C. 626, 627 (1987). "Our task on appeal is not to determine whether the trial court's decisions throughout the proceedings leading up to the [underlying motion] were appropriate, but whether, in light of [his] previous involvement with this case, 'the circumstances are such that a reasonable person would question whether the judge could rule impartially' . . . ." *In re: E.D.-A.*, __ N.C. App. __, __ (2023) (quoting *Harrington v. Wall*, 212 N.C. App. 25, 34 (2011)). We review a trial court's ruling on a judicial recusal motion de novo. *Dalenko v. Peden Gen. Contractors, Inc.*, 197 N.C. App. 115, 123 (2009), *disc. rev. denied*, 363 N.C. 854

- 37 -

(2010).

Here, despite his assertion that "the resolution of [the final motion for mistrial] hinged on [the trial judge's] own testimony[,]" Defendant has not shown that the trial judge was a witness for or against one of the parties in the case. Rather, the trial judge only became a witness as it relates to the recusal motion itself, which does not inherently constitute legal error. *See State v. Kennedy*, 110 N.C. App. 302, 306 (1993) ("[T]here was no error in the trial judge's failure to recuse himself. Having established that there were no facts presented to cause a reasonable person to doubt the trial judge's impartiality; there is also no error in the trial judge's failure to refer the motion to recuse to another judge."). Defendant's assertions that the trial judge acted as a "witness" obfuscate the fact that the substantive issue alleged with respect to Defendant's final motion for mistrial was the extrinsic factual knowledge of a juror, not the acts or omissions of the trial judge. And while the Record does reveal that a miscommunication between the bailiff and the trial judge may have occurred with respect to the underlying juror knowledge, we have no reason to believe "there exist[ed] such a personal bias, prejudice or interest on the part of the judge that he would be unable to rule impartially[,]" especially given the secondary importance of the miscommunication to the actual subject of the mistrial motion. *Fie*, 320 N.C. at 627. The trial court therefore did not err in denying Defendant's motion for recusal.

## **CONCLUSION**

The trial court correctly overruled Defendant's *Batson* objection at step three,

and it did not err in denying his motions for mistrial or failing to recuse.

NO ERROR.

Chief Judge STROUD and Judge ZACHARY concur in the result only.